(No. 65876.—

MICHAEL REED, Appellant, v. NORTHWESTERN PUBLISHING COMPANY, d/b/a The Commercial News, *et al.*, Appellees.

*Opinion filed October 20, 1988.*

496

498

Richard B. Opsahl, of Rantoul, for appellant.

Acton, Meyer, Smith & Miller, of Danville (Thomas B. Meyer, of counsel), and Nixon, Hargrave, Devans & Doyle, of Rochester, New York (William S. Brandt, of counsel), for appellees.

JUSTICE CUNNINGHAM delivered the opinion of the court:

In the circuit court of Vermilion County, plaintiff, a Danville police officer, filed this libel action against the Northwestern Publishing Company, doing business as The Commercial News (CN), and two of its reporters, Bob Wilson and Carl Young. Wilson and Young were authors of certain allegedly defamatory material concerning plaintiff appearing in CN. The circuit court initially granted defendants' motion for summary judgment, but this ruling was reversed on appeal (*Reed v. Northwestern Publishing Co.* (1984), 129 Ill. App. 3d 133), and trial was held. At the close of plaintiff's case, a judgment was directed in favor of Carl Young, and subsequently the jury found in favor of defendants CN and Bob Wilson.

Plaintiff appealed, raising substantially the same issues presented here, and the appellate court upheld the verdicts (159 Ill. App. 3d 699). Pursuant to Supreme Court Rule 315 (107 Ill. 2d R. 315), we granted plaintiff's petition for leave to appeal.

We shall briefly summarize the investigations of a police burglary ring which gave rise to the grand jury report and the newspaper articles involved in this action. We shall then summarize pertinent portions of the grand jury report and the newspaper articles. Next we shall analyze whether plaintiff is a "public official" for first amendment purposes. Then we shall discuss the evidence supporting the verdicts and address numerous alleged trial errors.

## I. INVESTIGATIONS LEADING TO GRAND JURY REPORT

During 1970 and 1971 there were (according to testimony of Randy Kirk, city editor of CN) suspicions and rumors afloat that some police officers in the Danville area were involved in burglaries. An internal investigation was conducted at that time through the Danville police department and the Vermilion County State's Attorney's office. However, investigators concluded at that point that insufficient evidence existed to bring charges against any officers. Some years later, in approximately 1975, CN reporters received (from undisclosed sources) some information regarding particular officers involved in some particular burglaries. CN reporters provided this information to the Vermilion County State's Attorney's office. With this information the State's Attorney's office launched a renewed investigation, which eventually led to an investigation by the grand jury.

The grand jury first met in September 1977 to investigate the alleged burglary ring. CN staff writers Les Smith and Dan Olmstead reported the fact of this meet-

ing in CN's September 8, 1978, edition (an article not directly in issue here), stating that the grand jury probe related to suspicions that "as many as seven former or present Danville police officers" may have been involved in burglaries.

The grand jury meetings occurred numerous times, concluding in 1978. Several officers who were alleged to have been involved in some of the burglaries were granted immunity from prosecution in return for their grand jury testimony. Other current and former officers were also called to testify.

## II. CONTENTS OF GRAND JURY REPORT

At the conclusion of its investigation, the grand jury submitted to Vermilion County Circuit Judge James Robinson a seven-page report (drafted by then-Assistant State's Attorney Craig DeArmond). The grand jury requested that the report be made public, and the report was released on December 20, 1978.

According to the grand jury report, 34 unsolved burglaries were committed in Danville in 1970 and 1971. The report noted that during 1970 and 1971 a series of suspicious burglaries attracted the attention of several ranking officers, and that during this time 37 burglaries were reported, of which only three were solved or cleared by arrest. The remaining 34 burglaries, according to the report, were all discovered by one of four officers, each of whom was either on patrol duty during a night shift or was voluntarily accompanying his colleagues on such patrol. The burglaries all occurred at night, and the targets were all commercial establishments. The report listed 14 particular burglaries for which the grand jury had received evidence.

The grand jury report refers to plaintiff twice. The first reference is in a summary of the testimony of Officer Joseph Miller, who at all relevant times worked for

the Danville police department. Miller had participated in an internal investigation of the suspected misconduct, and the grand jury report summarizes his testimony regarding a burglary of the local American Legion Hall as follows:

"Officer Miller described the Legion burglary of December 21, 1970 and how [Officer] Massey had fortuitously discovered an open window, failed to call it in, met with Officer Hill and returned to the Legion, leaving Miller posted outside. Miller testified that Massey had previously questioned him concerning whether upon finding a place broken into, would he accept something taken by officers[.] Massey also asked him what his favorite liquor was; to which Miller replied, 'Scotch'. After all officers who initially responded; including: Calvin Norman, Jerry Hill, Jack Roland and Michael Reed, had left, the owner was called to check out the premises. When they left the scene Officer Miller found a bottle of Scotch under his side of the seat in their squad car."

The grand jury report also refers to plaintiff in summarizing the testimony of Lieutenant Edwin McGee, who, like Miller, had participated in the police department's internal investigation. The grand jury report states:

"Lieutenant Edwin McGee testified as to his responding to the August 25, 1971 burglary at Harding's Pharmacy where he found Officers Hill and Reed at the scene with Roland and Massey showing up later. His investigation of the scene, specifically including the watch case and shaver display showed nothing to be missing or disturbed, however, when he read the report submitted the next day by Hill, it showed watches, shavers and radios to have been taken along with a large amount of cash."

The report states that a grand jury investigation should have been conducted years earlier. The report states that the limitations period had run regarding the burglary offenses and that officers could thus not be prosecuted for their participation in the offenses. The report concludes

that there "is no indication that the situation as it existed in 1970 and 1971 exists today."

### III. CONTENTS OF POST-REPORT NEWSPAPER ARTICLES

On December 21, 1978, the day following the release of the grand jury report, CN published four articles relating to the burglary ring, two of which articles appeared on the front page and are directly in issue here as being allegedly libelous. One such allegedly libelous article (under Bob Wilson's by-line) is entitled, "Grand Jury Describes Police Burglary Setup." It contains pictures of plaintiff and several other officers above the caption, "Current Officers Implicated in Report." Beneath the caption is the statement, "Four current law officers—Arnold Yanders, Robert Testa, Michael Reed and Kenneth Cox—were named by grand jury witnesses as joining in at least one or a few of the reported break-ins by policemen." The article itself states that the grand jury's investigation "determined that up to 10 police officers were involved in the break-ins." The article also states, "The 'usual practice', according to the grand jury testimony of a former policeman identified as one of the ringleaders, was to split whatever was taken among the patrolmen on the scene." The article also states that certain officers had admitted involvement in certain burglaries, and the article further states, "[The witnesses] identified other officers involved too. They included *** Patrolman Mike Reed ***." Later the article states, "Lieutenant Edwin McGee also testified about the Harding's incident, saying he came on the scene and found Hill, Roland, Massey and Officer Mike Reed inside but without their flashlights turned on."

The other December 21 article (containing no by-line but admittedly contributed to by Carl Young) is entitled, "3 Deny Roles in Burglaries," refers to Reed as one of

the officers "implicated" and quotes him as denying any involvement.

On December 22 a follow-up article by Bob Wilson was published, again mentioning plaintiff as one of the officers "implicated." This article focuses on the possibility of criminal or disciplinary charges against the officers and is entitled, "Next Move Weighed in Burglary Ring Case." Plaintiff did not base any cause of action on this article but apparently introduced it as evidence that in publishing other articles Wilson and CN acted with malice.

A December 23, 1978, allegedly libelous article by Bob Wilson also discusses the possible action against the officers and again lists Mike Reed as one of the current officers "named as participants in one or more incidents."

On March 6, 1979, CN published another allegedly libelous article written by then-staff writer Carl Young. This article is entitled, "Policemen Face Choice: Take Lie Detector Tests or be Fired." The article does not mention particular officers by name but states that "the grand jury *** reported that up to 10 police officers *** were involved in break-ins at local service stations and stores in 1970-71." The article goes on to state that "the report said 3 of the officers were still on the Danville police force." The assertion either that three current officers had been implicated in a burglary ring or that three current officers had been implicated in at least one of the break-ins is again made in an allegedly libelous article written by Carl Young, appearing on March 10, 1979, and in two allegedly libelous articles appearing on March 28, 1979, and March 29, 1979, respectively, neither of which contains a by-line.

On April 6, 1979, CN published an article by Carl Young summarizing the results of the lie detector tests. The article states in part:

"Officers Mike Reed and Joseph Miller took the tests and passed, [Mayor David] Palmer said. No disciplinary action will be taken against them, he said.

'Although he (Reed) was named in the grand jury report, we could find absolutely no evidence of wrongdoing on his part,' Palmer said. He said there was 'absolutely' no evidence of wrongdoing on the part of Miller."

Plaintiff wanted this article admitted on the question of malice, but defendants objected to the article on relevance grounds and it was excluded.

CN published several articles covering the progress of the instant libel action. Plaintiff sought to have these articles admitted as indicating prior malice, but these articles were refused as irrelevant.

## IV. PLAINTIFF IS A PUBLIC OFFICIAL

The United States Supreme Court has emphasized that erroneous statements are inevitable in free debate, and that such statements must be afforded some protection if freedoms of expression are to have the "breathing space" which they need to survive. (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 272-73, 11 L. Ed. 2d 686, 701-02, 84 S. Ct. 710, 721-22.) To afford this "breathing space" to public debate, the United States Supreme Court has held that a "public official" seeking to recover for libel with respect to comments involving his official conduct must prove that the statements were made with "actual malice," that is, with knowledge that the statements were false or with reckless disregard of whether the statements were false. 376 U.S. at 279-80, 11 L. Ed. 2d at 706, 84 S. Ct. at 726.

Following the *New York Times* decision, the Supreme Court in *Rosenblatt v. Baer* (1966), 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669, had occasion to discuss the meaning of the term "public official." The Court stated that the "designation applies at the very least to those

among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." (383 U.S. at 85, 15 L. Ed. 2d at 605, 86 S. Ct. at 676.) The Court further stated that the designation applies "[w]here a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." 383 U.S. at 86, 15 L. Ed. 2d at 606, 86 S. Ct. at 676.

This court had occasion to apply the definition of "public official" in *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, in which a police officer sought damages for allegedly libelous statements. We found that the officer was a public official, stating:

> "Although as a patrolman he is 'the lowest in rank of police officials' and would have slight voice in setting departmental policies, his duties are peculiarly 'governmental' in character and highly charged with the public interest. It is indisputable that law enforcement is a primary function of local government and that the public has a far greater interest in the qualifications and conduct of law enforcement officers, even at, and perhaps especially at, an 'on the street' level than in the qualifications and conduct of other comparably low-ranking government employees performing more proprietary functions. The abuse of a patrolman's office can have great potentiality for social harm; hence, public discussion and public criticism directed towards the performance of that office cannot constitutionally be inhibited by threat of prosecution under State libel laws." 40 Ill. 2d at 265.

Plaintiff has asked us to reconsider our decision in *Coursey.* He submits that this court erroneously applied the "public official" designation as that term has been interpreted by the United States Supreme Court. He ar-

gues that a police officer neither has nor appears to have substantial responsibility for or control over government affairs. He further indicates that the public does not take an interest in the qualifications and performance of a police officer except when he becomes involved in a particular controversy.

Plaintiff also directs our attention to the comment in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, that "[p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally do." (418 U.S. at 344, 41 L. Ed. 2d at 808, 94 S. Ct. at 3009.) Plaintiff submits that a police officer does not have such access to the press and that therefore part of the rationale for designating an individual a "public official" is inapplicable here.

Plaintiff also argues that "the Supreme Court has not held that anyone as low ranking as a policeman or as a teacher is a public official," and suggests that the designation applies only to higher-ranking employees. The status of a teacher is not at issue here, and we do not comment on such status. As his argument applies to the status of a police officer, however, we agree with the observation in *McLain v. Arnold* (1980), 275 S.C. 287, 270 S.E.2d 124, where the court stated, "[S]imply speaking, the status of a public official may be deemed sufficient to warrant application of the *New York Times* privilege, not because of the government employee's place on the totem pole, but because of the public interest in a government employee's activity in a particular context." 275 S.C. at ___, 270 S.E.2d at 125.

We adhere to our conclusion in *Coursey* that a police officer is a public official. In this regard we initially disagree with plaintiff's conclusion that police officers lack

greater access to the press than do members of the general public. Moreover, access to the press is not the test in determining whether a person is a public official, but is merely an advantage enjoyed by many public officials. As noted by Justice Powell in *Gertz*, 418 U.S. at 344, 41 L. Ed. 2d at 807, 94 S. Ct. at 3009, "it is often true that not all of the considerations which justify adoption of a given rule will obtain in each particular case decided under its authority."

Further, it is significant that in the 20 years since the *Coursey* decision was rendered, countless decisions throughout the country have addressed the issue, and none to our knowledge has held to the contrary. (Several courts, however, have indicated that certain libelous statements were unrelated to an officer's official conduct and were therefore not qualifiedly privileged. See, *e.g.*, *Himango v. Prime Time Broadcasting, Inc.* (1984), 37 Wash. App. 259, 680 P.2d 432; *Tilton v. Cowles Publishing Co.* (1969), 70 Wash. 2d 707, 459 P.2d 8.)

The cases deeming a police officer a public official are based on sound reasoning. For example, we find particularly insightful *Gray v. Udevitz* (10th Cir. 1981), 656 F.2d 588, 591, in which the court stated:

> "The cop on the beat is the member of the department who is most visible to the public. He possesses both the authority and the ability to exercise force. Misuse of his authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of his qualifications and job performance warrant[s] the conclusion that he is a public official."

In accord with *Gray* is *Moriarty v. Lippe* (1972), 162 Conn. 371, 378, 294 A.2d 326, 330-31, in which the court pointed out that "[a]lthough a comparatively low-ranking government official, a patrolman's office, if abused, has

great potential for social harm and thus invites independent interest in the qualifications and performance of the person who holds the position." Also on point is *Smith v. Russell* (Fla. 1984), 456 So. 2d 462, 464, in which the court found that a police officer was a public official and stated:

"The plaintiff is a highly visible representative of government authority who has power over citizens and broad discretion in the exercise of that power. There are probably no public employees more recognizable than armed uniformed police officers. Most citizens are interested [in police officers' qualifications] beyond their general interest in the qualifications and performance of all government employees."

We also find persuasive *Roche v. Egan* (Me. 1981), 433 A.2d 757, 762, in which the court observed:

"Law enforcement is a uniquely governmental affair. The police detective, as one charged with investigating crimes and arresting the criminal, is in fact, and also is generally known to be, vested with substantial responsibility for the safety and welfare of the citizenry in areas impinging most directly and intimately on daily living: the home, the place of work and of recreation, the sidewalks and streets. The nature and extent of the responsibility of a police detective is punctuated by the fact that a firearm, no less than a badge, comes with his office."

Plaintiff submits that courts should determine that, for purposes of applying the public official designation, there are three groups of public employees. He submits that (1) employees in certain positions can as a matter of law be deemed public officials, (2) some are as a matter of law not public officials, and (3) others should be tested by a "fact intensive analysis" on a case-by-case basis as to whether they are public officials as a matter of fact. Arguing that he falls into the third category, he submits that there is no evidence in the record to indicate that he himself is a public official.

In *Rosenblatt v. Baer* (1966), 383 U.S. 75, 88, 15 L. Ed. 2d 597, 606, 86 S. Ct. 669, 677, the Court held that "it is for the trial judge in the first instance to determine whether the proofs show respondent [a supervisor of a county recreation area] to be a 'public official.' " The Court noted that "[s]uch a course will both lessen the possibility that a jury will use the cloak of a general verdict to punish unpopular ideas or speakers, and to assure an appellate court the record and findings required for review of constitutional decisions." 383 U.S. at 88 n.15, 15 L. Ed. 2d at 607 n.15, 86 S. Ct. at 677 n.15.

Although we do not question that there may well be governmental employees whose positions require the extensive "fact intensive analysis" which plaintiff requests, the United States Supreme Court clearly has not required this with respect to those government positions the duties of which are widely recognized. Indeed, in the landmark decision of *New York Times*, the Court relied not on a detailed exposition of the plaintiff's duties but on the fact that his duties were generally the supervision of certain city departments. (*New York Times*, 376 U.S. at 256, 11 L. Ed. 2d at 692, 84 S. Ct. at 713.) We note also that the numerous decisions discussed above which have found a police officer to be a public official did so not on the basis of duties unique to that plaintiff but on the basis of duties of police officers generally. We further note that, as recognized in *Belli v. Orlando Daily Newspapers, Inc.* (5th Cir. 1967), 389 F.2d 579, 588, "[i]n most cases it is a relatively simple matter to determine whether the plaintiff is a public *official* and whether the defamatory comment is directed toward his *official* capacity." (Emphasis in original.) We note that plaintiff testified at trial regarding his job duties, and we hold that in the absence of any indication that plaintiff did not perform the ordinary and customary duties of a beat po-

lice officer, it was appropriate for the circuit court to conclude that he was a public official.

## V. THE VERDICTS WERE WARRANTED BY THE EVIDENCE

The circuit court directed a verdict in favor of Carl Young due to an insufficiency of evidence of actual malice on his part. Having been directed that Carl Young acted without malice, the jury was required to consider the alleged malice of only Bob Wilson and the corporate defendant. The jury found (in special interrogatories) that no such malice existed with respect to either the December 21, 1978, article with Bob Wilson's by-line, the captions and pictures accompanying that article, the December 23, 1978, article, the March 6, 1979, article, the March 28, 1979, article, or the March 29, 1979, article.

### A. Directed Verdict for Carl Young

The United States Supreme Court has held that a ruling on a motion for a directed verdict or summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." (*Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 252, 91 L. Ed. 2d 202, 214, 106 S. Ct. 2505, 2512.) While *Anderson* was applying the Federal Rules of Civil Procedure, its observation was equally applicable to actions in State court. With respect to libel claims brought by public officials relating to their official conduct, the first amendment "mandates a 'clear and convincing' standard, [and] the trial judge in disposing of a directed verdict motion should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity." 477 U.S. at 252, 91 L. Ed. 2d at 214, 106 S. Ct. at 2512.

Plaintiff fell far short of establishing with convincing clarity that Carl Young's role in publishing any articles at issue involved "actual malice." His role in one of the December 21, 1978, articles (the article containing no by-line) was peripheral at most. His testimony indicates that he was asked to call and obtain statements from one or more officers mentioned in the report. He remembers calling only one officer. He does not recollect calling Officer Reed, and there is no testimony in the record that he did so. (Reed does not remember who from CN called him.) Carl Young remembers typing his notes of these conversations and believes that he gave the notes to Les Smith. Carl Young does not know whether Les Smith actually wrote the article. Although Carl Young had by this point "glanced at" the grand jury report mentioning Reed, there is no indication that he had studied the report at any length. Rather, a fair reading of his testimony indicates that he was busy that day preparing his "scanner" (police beat) report, was asked to call one or more officers, hurriedly did so and made notes of his conversations, and then returned to his other duties. If the burden of proof in this case were less than it is, then plaintiff would perhaps have a better argument that the motion for a directed verdict should have been denied. However, after reading the record, we, like the circuit court, fail to see how a reasonable jury could find that plaintiff had established with clear and convincing evidence that on December 21, 1978, Carl Young wrote that Reed was implicated in the report. There is even less evidence that Young made such a statement while actually entertaining serious doubts as to the truth of the assertion.

The second article about which Carl Young's involvement was questioned appeared on March 6, 1979. That article contains the following language:

"A seven page summary of the usually secret grand jury testimony was released to the public, and it named three current officers and one sheriff's deputy as participants in at least one of the 1970-71 break-ins."

Although Carl Young stated that he "probably" read the grand jury report between the time that the December articles were published and the time that this article was published, he stated that he based the above-quoted statement on previous stories—stories which he had little, if any, role in writing. Considering testimony that Young relied on previous stories, and considering that the report itself is extremely murky in its discussion of numerous officers, including Michael Reed (so that unless one scrutinizes the report one could very well conclude that Reed had been "implicated"), we agree with the circuit court that a jury could not reasonably find "clear and convincing evidence" that Carl Young had "a high degree of awareness" of the probable falsity of his articles.

Insufficiency of evidence with regard to malice of Carl Young is equally applicable to the other articles about which he was questioned; there simply is insufficient evidence, circumstantial or otherwise, to rise to the level of "clear and convincing" proof.

### B. Verdict for Bob Wilson

Plaintiff submits that the jury's verdict in favor of Bob Wilson was against the manifest weight of the evidence. Keeping in mind the heavy burden of proof which the United States Supreme Court has imposed upon public official libel plaintiffs, we must disagree with plaintiff's assertion.

There can be no doubt that Bob Wilson failed to scrutinize the grand jury report as carefully as (one would hope) a responsible journalist would do. He even acknowledged that in the December 21, 1978, article, he

had falsely asserted that a witness testified to finding Reed inside a dark, burglarized building without his flashlight on. Wilson stated that he had "mixed up some details with another break-in at another place where officers were seen inside without their flashlights on." Moreover, the jury explicitly found (by special interrogatory) that Bob Wilson's December 21, 1978, article, as it relates to plaintiff, was false. We cannot, however, say that the jury's finding (also by special interrogatory) that Wilson acted without malice is against the manifest weight of the evidence.

In this regard we again note, without disputing the jury's finding of falsity, that a less than thorough reading of the grand jury report could easily leave one with the conclusion that plaintiff was involved in some burglaries to some extent. The possibility of this happening is particularly evidenced by the testimony (in an offer of proof) of the assistant State's Attorney who drafted the report; the drafter indicated that he himself believed he was naming Reed as being "peripherally involved." We further note that, at the request of the city editor, Randy Kirk, Wilson called the State's Attorney's office and made some effort to verify his report. Wilson testified as follows in response to questioning regarding what he asked when calling the State's Attorney's office:

"A. I asked—I believe I first asked the State's Attorney, Thomas Fahey, and he referred me to Craig DeArmond since Craig DeArmond conducted the grand jury and authored the report.

Q. What conversation did you have with Mr. DeArmond?

A. I asked Mr. DeArmond what it meant to have these—for these officers names to be included in this report.

Q. What did he indicate to you?

A. He said that those officers, unless their roles are otherwise spelled out, were those officers identified by

two or more witnesses placed at the scene of two or more of these police burglaries.

Q. Did he indicate to you that they were involved?

A. Not in—not each one as to their specific acts."

Although this testimony does not indicate a thorough investigation on Wilson's part, it certainly weakens the assertion that when writing the article he entertained serious doubts as to its accuracy.

Plaintiff argues, however, that actual malice is clear from certain additional evidence. In this regard plaintiff points out that Wilson acknowledged looking at the log of grand jury witnesses in September 1977, when the grand jury was first convening regarding the alleged burglary ring. Plaintiff apparently deems this relevant because the grand jury report states that the accused officers were given the opportunity to testify. Plaintiff seemingly argues that Wilson must have recognized that Reed was not an accused officer since his name did not appear on the list of grand jury witnesses. We find this argument unpersuasive for several reasons. First, the grand jury met on numerous occasions after September 1977; the absence of Reed's name from a witness list in September does not exclude the possibility that he was later called as a witness. Second, one can hardly conclude that the reporter recalled the names on that log when reading the grand jury report 15 months later. Nor does evidence that he had previously heard certain officers named as being involved (and had not heard Reed implicated) indicate that, after reading the grand jury report and calling the State's Attorney's office, he subsequently seriously doubted that the grand jury report implicated Reed. Finally, contrary to plaintiff's assertion, the fact that in attempting to meet a press deadline Wilson spent only about three hours writing the article does not necessitate a conclusion that he seriously doubted its accuracy.

With respect to the December 23, 1978, article authored by Bob Wilson (an article which the jury found was also false as to plaintiff), we agree that Wilson's failure to reread the grand jury report evinces some carelessness, but we cannot say that as a matter of law this failure requires a finding of actual malice.

## C. Verdict for CN

Having established that the jury's verdict in favor of Bob Wilson is supportable and that the directed verdict in favor of Carl Young was proper, we next turn to the contention that the jury's verdict in favor of the corporate defendant, CN, was against the manifest weight of the evidence.

A corporation's liability for slander or libel is based on the doctrine of *respondeat superior*; a corporation is jointly and severally liable for libelous statements actionable against its employee when the employee is acting within the scope of his employment. (*Windsor Lake, Inc. v. WROK* (1968), 94 Ill. App. 2d 403; *Randall Dairy Co. v. Pevely Dairy Co.* (1934), 274 Ill. App. 474. See also *Gertz v. Robert Welch, Inc.* (7th Cir. 1982), 680 F.2d 527, 539 & n.19 (imputing an agent's actual malice to the corporate defendant).) We cannot, however, circumvent the actual-malice requirement in this case by pooling all of the information arguably within the knowledge of various employees and imputing all of that knowledge to the corporate defendant to establish that the corporate defendant acted with actual malice. This is what plaintiff seems to be asking us to do, pointing out the various items of information which at some point were known (or may have been known) to different employees. In our view, before a corporate defendant may be found liable under the actual-malice standard, there must be a finding that at least one agent or employee involved in publishing the material acted with actual malice. As already

discussed, defendant has not established that either Wilson or Young acted with actual malice. We also believe (as discussed below) that there was insufficient evidence to necessitate a finding that any other employee involved acted with actual malice. The other employees somewhat involved in the publications at issue include Randy Kirk and Ronald Dillman.

The evidence established that Randy Kirk, city editor at the time of the publications in issue, had heard a "flurry of rumors" in 1970 and 1971 about various officers being involved in burglaries. He had heard some specific names mentioned, and Reed's name was not among them. In 1976 or 1977 an undisclosed source gave CN particular names and dates regarding particular burglaries, which information was passed along to Kirk. Still, Reed's name was never mentioned to Kirk. In fact, Kirk acknowledged that Reed's name was never mentioned to Kirk before release of the grand jury report.

Kirk's knowledge that certain individuals were allegedly involved, in conjunction with the fact that Reed's name was not mentioned to him, does not, in our view, amount to such clear and convincing evidence that a jury would be required to find that Kirk acted with actual malice. This is particularly true in view of the undisputed evidence that, upon seeing the long list of officers listed in the draft of Bob Wilson's December 21, 1978, article, Kirk explicitly instructed Wilson to verify the names with the State's Attorney's office, and that Wilson later reported to Kirk that he had done so. Nor, in our view, does the failure to do any further checking into this same issue before allowing the follow-up story necessarily establish actual malice on Kirk's part. Kirk supervised 12 reporters, and there is no evidence that he undertook or should have undertaken the task of verifying all of the facts in a story—a task which the testi-

mony indicates was primarily left to the individual reporters.

Ron Dillman, the executive editor at the time the articles in issue were published, was kept abreast of the stories' contents. He gave uncontradicted testimony that he directed Kirk to verify the facts in the December 21, 1978, story. In view of this evidence, we fail to see how the jury could be required to find that Dillman acted with actual malice. Nor do we believe that his failure to do any additional investigation before allowing follow-up stories to be published necessarily indicates actual malice. Dillman was in charge of overseeing the newspaper's entire operation; it is simply not realistic to expect Dillman to have verified the role of each officer who his reporter stated was implicated.

In reviewing the jury's conclusions regarding lack of malice, we have found that the circuit court failed to submit any jury instructions as to one of the December 21, 1978, articles, namely, the article which contained no by-line but to which Carl Young admittedly contributed. Perhaps the parties understood that since there was no proof of any other CN employee's involvement in this article, and since a verdict was directed for Carl Young, there was no need to submit an instruction on this article to the jury. The record is completely unclear on why this particular December 21 article was dropped from deliberation, and the parties have not addressed this occurrence. In any event, it is clear that if there were any error in failing to have the jury make an explicit finding regarding this article, the error was waived by failure to object at trial. (See *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500.) It is equally clear that any such error was harmless. The reason is that the only individuals (other than Carl Young) arguably shown to be involved in this second December 21, 1978, article were as much (if not more) involved in the other Decem-

ber 21 article, which contained the same allegedly libelous statement that plaintiff had been "implicated" in burglaries. The jury's having found no malice with respect to the first December 21 article, it is manifest that the jury was equally unconvinced of malice with regard to the second December 21 article.

## VI. INSTRUCTIONS REGARDING ACTUAL MALICE

Plaintiff next submits that errors were committed in instructing the jury regarding actual malice. The court instructed the jury in part as follows:

> "The term 'actual malice' is a legal term and does not lend itself to an exact definition. In defining 'actual malice,' I instruct you that as a matter of law, Michael Reed is a public official, and public officials in actions based on libel must show that the defendant either knew that the statement was false or that the defendant had a reckless disregard for the accuracy of the statements.
>
> Reckless disregard is not measured by whether a reasonably prudent person would have published or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of the publications. Publishing with such doubts shows reckless disregard for the truth or falsity."

This instruction adequately conveys to the jury that "actual malice" denotes knowledge of a statement's falsity or serious doubts as to its truth. Plaintiff does not challenge this instruction directly. Rather, he submits that the circuit court erroneously refused additional instructions on the actual-malice issue, instructions which he believes clarify the meaning of actual malice and the means of proving it. We examine these instructions with due regard for the fact that, while a party is entitled to have the jury accurately instructed, he has no right to have any particular instruction submitted if the subject of the instruction is adequately covered in other instruc-

tions; needless repetition in jury instructions should be avoided. See, *e.g., Kingston v. Turner* (1987), 115 Ill. 2d 445, 448.

The first instruction regarding actual malice which plaintiff submits was erroneously refused states:

> "If you determine serious inaccuracies were made by a defendant in the reporting of the grand jury report, you may consider this as a factor in determining whether there was underlying malice."

This instruction does no more than inform the jury that they may rely on circumstantial evidence to determine a fact in issue; the import of the instruction is that the more serious the inaccuracy, the more likely its author may have acted with actual malice. The jury clearly understood that if it believed that such an inference were an accurate one, it was perfectly free to draw such an inference. The jury was instructed on circumstantial evidence as follows:

> "A fact may be proved by circumstantial evidence. Circumstantial evidence consists of proof of facts which give rise to a reasonable inference of the truth of the fact sought to be proved."

Considering this standard instruction, we believe the jury was adequately instructed on the use of the circumstantial evidence upon which plaintiff now focuses.

The next instruction which plaintiff submits was erroneously refused states:

> "Actual malice does not necessarily connote personal spite or ill will so much as an intention to do an act from which injury may be expected. Reckless disregard implies a higher degree of culpability than negligence. Reckless means indifference to consequences."

In indicating that reckless disregard for the truth of a matter means "indifference to the consequences," this instruction is inaccurate. "Reckless disregard," for first amendment purposes, does not mean indifference.

Rather, it means entertaining serious doubt as to a statement's truth. The instruction is also inaccurate in indicating that actual malice means an intention to do an act from which injury may be expected. Clearly, in publishing material indicating that an individual is a burglar, an author recognizes that injury may be expected. The issue, however, is whether he knows that the statement is false or seriously doubts that the statement is true. Because this instruction was substantially inaccurate, it was properly refused.

The next instruction which plaintiff submits was erroneously refused states:

"Actual malice is a state of mind. It is a lack of reasonable grounds for belief in the truth of the published statement and therefore a reckless disregard of the rights of the plaintiff. Malice may not be implied or inferred merely from the fact of the publication or merely from negligence in the publication. However, actual malice may be proved by either direct or circumstantial evidence."

In indicating that actual malice is a lack of reasonable grounds for belief in the truth of a published statement, this instruction is clearly erroneous. This instruction contains language more indicative of a negligence standard, a standard which was inapplicable to this case. Moreover, the reference to circumstantial evidence is redundant of a separate instruction. For these reasons, the instruction was properly refused.

Plaintiff next submits that the following instruction was erroneously refused:

"You, the jury, are instructed that actual malice may be inferred when the investigation for a story which is not 'hot news' is grossly inadequate."

To support this proposition plaintiff cites *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975. In *Curtis Publishing Co.*, Justice Harlan, in a plurality opinion, stated that with respect to

"public figures" (as distinguished from "public officials"), actual malice should not be required and a showing of "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers" should be sufficient. (388 U.S. at 155, 18 L. Ed. 2d at 1111, 87 S. Ct. at 1991.) Justice Harlan then concluded that the jury "must have decided that the investigation *** was grossly inadequate in the circumstances" (388 U.S. at 156, 18 L. Ed. 2d at 1112, 87 S. Ct. at 1992), a finding which he found was supported by the evidence and which he believed justified a verdict for the plaintiff for false publication. Justice Harlan thus did not state that "actual malice" could be shown by failure to investigate, but merely that "with respect to public figures" actual malice should not be required. The majority, however, rejected this conclusion and the Court has subsequently applied the actual-malice standard to public figures. (See *Herbert v. Lando* (1979), 441 U.S. 153, 156, 60 L. Ed. 2d 115, 121, 99 S. Ct. 1635, 1638-39.) Plaintiff has thus misconstrued *Curtis Publishing Co.*, as did *Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, upon which he also relies.

Plaintiff thus has not cited any authority indicating that this instruction properly states the law. However, even assuming, *arguendo*, that the instruction does accurately state the law, it would nevertheless have been error for the circuit court to submit it, for numerous reasons. First, plaintiff did not tender an instruction containing, nor have we found, a definition of "hot news," the colloquial term used by Justice Harlan. The definition of this term is certainly subject to disagreement. Second, and more important, the instruction improperly focuses the jury's attention on a single point that plaintiff wished to emphasize—the adequacy of the investigation—rather than on the critical subjective in-

quiry of whether defendant did actually entertain serious doubts as to the truth of a publication. This court has long held that instructions singling out particular facts or evidence and giving them undue prominence are erroneous. (See, *e.g., Mount v. Dusing* (1953), 414 Ill. 361; *Garvey v. Chicago Rys. Co.* (1930), 339 Ill. 276; *Hoffman v. Ernest Tossetti Brewing Co.* (1912), 257 Ill. 185.) We further find that this instruction is argumentative and was improper on this basis as well. Jury instructions should not be argumentative in form. (*City of Waukegan v. Stanczak* (1955), 6 Ill. 2d 594.) We further find that the instruction on circumstantial evidence, in conjunction with the instruction on actual malice, adequately informed the jury regarding the relevance of any inadequacy in the investigation.

Plaintiff next complains of certain comments made by the circuit court in ruling on the use of evidence, comments which plaintiff claims "psychologically induc[ed] in the jury a predilection to place upon the plaintiff an insurmountable burden of proof." We find none of these statements improper. In each instance the court was either stating its reason for excluding evidence or explaining the limited purpose for which such evidence could be presented. This court long ago held that a statute stating that jury instructions are to be written was not intended to preclude a circuit court, in admitting evidence, from orally telling the jury the limited purpose for which certain evidence is being presented. (*People v. Horn* (1923), 309 Ill. 23.) We believe that the current provision regarding written instructions (Ill. Rev. Stat. 1987, ch. 110, par. 2—1107) also was not intended to preclude such contemporaneous explanations by the circuit court. It is also well-established that a circuit court, in ruling on the admissibility of evidence, may state its reasons for such rulings without violating the provision requiring written

jury instructions. See *South Park Commissioners v. Ayer* (1910), 245 Ill. 402.

## VII. INSTRUCTIONS REGARDING BURDEN OF PROOF

Plaintiff next argues that the circuit court erred in refusing four of his jury instructions regarding the burden of proof. The first such instruction is based on Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971) (IPI Civil 2d). The instruction submitted provides in part that under certain conditions a party's failure to produce a witness may permit an inference that the witness' testimony would have been unfavorable to that party. Plaintiff refers us to testimony of Randy Kirk, city editor of CN when the stories here in issue were published. Mr. Kirk testified that "at 9 a.m. each day we have \*\*\* an editorial board meeting" and that such a meeting was held on the morning that the first allegedly libelous article was published. Plaintiff submits that defendant's failure to produce certain persons who attended this meeting justifies giving IPI Civil 2d No. 5.01. Kirk's testimony, however, indicated that he did not recall the details of the December 21 meeting and only presumes that he told those in attendance that the burglary story was to be published that day. His testimony does not indicate that he named the particular officers to be mentioned in the story or that plaintiff's name was even mentioned. Considering that there is virtually no evidence indicating that the others attending the meeting received any information incriminating to defendants, and further considering the fact that their recollection would have greatly lessened during the eight years that elapsed between the time of that meeting and the time of the trial, we find that the court did not abuse its discretion in refusing the instruction. We agree with the holding in *Maynard v. Irving Davis Co.* (1970), 122

Ill. App. 2d 28, that the circuit court should have wide discretion in determining whether to give this instruction.

Plaintiff next submits that the circuit court erroneously refused his instruction No. 13, which states the burden of proof. A court does not err in refusing to give an instruction which is fully covered by another instruction which the court does give. (*Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, *cert. denied* (1959), 361 U.S. 127, 4 L. Ed. 2d 180, 80 S. Ct. 256; *Ergang v. Anderson* (1941), 378 Ill. 312.) Such is the case here. The court properly defined both "preponderance of the evidence" and "clear and convincing evidence" when reading the issues instructions, and these are the definitions which plaintiff's instruction No. 13 sought to define. The court also articulated which burden of proof applied to which issues, indicating that plaintiff must prove by clear and convincing evidence actual malice.

Plaintiff next complains that the court refused his instruction "which summarizes and defines what libel is." Plaintiff's instruction is similar to one given except that his instruction explicitly mentions pictures as a form of publication which can be libelous, whereas the instruction actually given refers only to "written statements." We believe that in applying the instruction which they actually received, the jurors would have naturally considered the picture of Michael Reed in conjunction with his name and the caption appearing under the picture, which caption is entitled, "Current Officers Implicated in the Report." In any event, any error in refusing plaintiff's instruction was harmless, since the court directed a finding that publication of the caption and photograph was defamatory as a matter of law.

## VIII. ADDITIONAL ALLEGED TRIAL ERRORS

Plaintiff's next complaint relates to a reference in

certain of the articles indicating that a lie detector test would be given to all policemen potentially involved, including him. Plaintiff submits that, considering such references, the circuit court erred in refusing to admit an April 6, 1979, CN article explaining the outcome of the lie detector tests and indicating that plaintiff passed the test. However, as the circuit court made clear to the jury, plaintiff's innocence or guilt was not at issue; the issue was whether CN accurately reported the contents of the grand jury report. Consequently, the results of the lie detector tests were irrelevant, and the court did not err in excluding the article. It would have diverted attention from the issues critical to the resolution of the case.

Plaintiff next submits that the court erroneously refused to submit his Exhibit 2 to the jury. Exhibit 2 is a September 8, 1977, CN article stating that "sources" indicate that "as many as seven officers" were involved in the break-ins. This was not an article alleged to be libelous. Rather, plaintiff attempted to use this article to show that months before the grand jury report was issued defendants knew that only seven officers were involved in the break-ins and that plaintiff was not one of them.

Initially we note that plaintiff apparently is mistaken in concluding that the jury was not given the exhibit. The transcript relates that the circuit court initially determined which exhibits would go into the jury room and did not include Exhibit 2. Thereafter, the following exchange took place:

> "DEFENSE COUNSEL: Our position is that if they're going to have the grand jury report, they should have everything.
> THE COURT: Copies of newspapers?
> PLAINTIFF'S COUNSEL: Right, all of them.
> THE COURT: Alright."

Thus, the record suggests that this newspaper article was, in fact, given to the jury. If, however, Exhibit 2 was not given to the jury for their deliberations, plaintiff's counsel did not object and therefore the issue was not preserved for appeal. Moreover, plaintiff would not have been denied a fair trial by the failure to submit this exhibit, and therefore this would be an inappropriate case to apply the exception to the waiver rule. (See *McElroy v. Force* (1967), 38 Ill. 2d 528, 535.) The relevance of this exhibit was extremely tenuous; even if in September 1977 the defendants knew that only seven officers were involved and that plaintiff was not among them, this fact would not be inconsistent with the conclusion that many months later plaintiff did become suspected.

Plaintiff next argues that the court erroneously refused to admit into evidence, or allow interrogation regarding, articles published after the instant suit was filed (post-filing publications). Plaintiff argues that these post-filing publications were probative of whether the defendants herein published the earlier articles (the allegedly libelous articles here in issue) with actual malice.

We note again that it appears from the record that all newspaper articles presented did go to the jury. However, assuming, *arguendo*, that these particular articles were withheld from the jury, it was within the court's discretion to do so, for these post-publication articles lack significant probative value. The reason is that there was no evidence, other than the evidence presented of knowledge preceding the publication of the articles in issue, that defendants knew or seriously questioned the truth of these post-filing publications. The cases cited by plaintiff in support of his argument indicate that any subsequent publishing of a libel with knowledge of its falsity is evidence of actual malice. However, in the instant case plaintiff showed only that CN repeated its

statements after plaintiff filed suit; there is no showing that, during the interim between when the initial articles and the post-filing articles were published, CN gained any additional information which led it to question its initial newspaper accounts.

Plaintiff's next complaint relates to testimony of Craig DeArmond, who during 1978 and 1979 was an assistant State's Attorney of Vermilion County. DeArmond testified during direct examination by plaintiff's counsel that during 1978 and 1979 Thomas Fahey, State's Attorney, had a policy established that all telephone calls regarding opinion matters were to be referred to him, and that such policy would encompass a phone call seeking an interpretation of a grand jury report. DeArmond then testified that he did not recall whether CN reporter Bob Wilson talked to him on December 21, 1978. Subsequently, on cross-examination, DeArmond was asked whether he did not know if such a conversation occurred on December 21, 1978, or whether he merely did not remember whether such a conversation occurred. After DeArmond indicated that he simply could not remember, defense counsel, over objection, quoted some earlier trial testimony of Bob Wilson, and asked whether such testimony refreshed DeArmond's memory. The Wilson testimony quoted was: "I believe I first asked the State's Attorney, Thomas Fahey, and he referred me to Craig DeArmond, since Craig DeArmond conducted the grand jury and authored the report."

Plaintiff submits that quoting this prior testimony was an improper means of refreshing DeArmond's recollection. However, we agree with the numerous appellate decisions holding that the manner and mode of refreshing a witness' recollection is largely within the discretion of the circuit court. (See, *e.g., People v. Black* (1980), 84 Ill. App. 3d 1050, 1054; *People ex rel. Raines v. Price* (1976), 37 Ill. App. 3d 921, 925; *People v. Van Dyk*

(1976), 40 Ill. App. 3d 275, 279; *Kerz v. Arkin* (1971), 2 Ill. App. 3d 1057, 1061.) While it clearly would be a better practice to have the prior testimony recounted outside the jury's presence, so as not to unduly emphasize certain testimony, we cannot say that the circuit court abused its discretion in permitting this verbatim recitation of an extremely brief portion of Wilson's testimony, testimony with which the jury was already familiar.

Plaintiff's final argument is that he was unfairly prejudiced when Les Smith, a reporter for CN from 1972 through 1978, refused to disclose a source of some information which he obtained relating to the burglary ring. Les Smith testified that in the late winter or early spring of 1977, another CN reporter ("Dan") received some information from a confidential source that burglaries were being conducted by police officers. Smith and this other reporter checked into those allegations and found no evidence that any such burglaries were then occurring but "did come across allegations that some had occurred in the early 1970's." These sources were "trusted police officers," and some of these sources gave the reporters names of officers allegedly involved in the burglaries. Smith testified as to five names which he specifically recalled hearing at the time, but he could not recall whether other names were also mentioned. He did, however, state that at no point prior to reading Wilson's December 21, 1978, article did he hear plaintiff's name mentioned in connection with the burglary.

Despite a court ruling requiring disclosure of Smith's sources, Smith refused during discovery to disclose those sources, and at trial he again refused. At no point did the court impose sanctions for this noncompliance. Rather, outside the presence of the jury, the court again listened to arguments of counsel on this issue and concluded that the names of these sources were not relevant. For reasons explained below, we believe that the

court did not abuse its discretion in reaching this conclusion.

It is important to emphasize that Les Smith was not a defendant and that the article which he wrote was not one of the allegedly libelous ones; rather, it was published over 15 months prior to the earliest allegedly libelous article. It is also important to note that Smith did not claim that his sources had implicated plaintiff. Plaintiff nevertheless attempts to establish relevance on the theory that these sources not only failed to mention plaintiff but also told Smith that only the officers whom they mentioned were involved. Plaintiff then argues that the conclusion which Smith must have drawn is that plaintiff was definitely not involved. It of course strains reasonableness to argue that the sources would have purported to be sure that only certain individuals were involved and no others. However, plaintiff reaches this conclusion and then submits that perhaps the authors of the allegedly defamatory articles also talked to these same sources and were given the same definitive list of the only officers involved—a list not mentioning plaintiff. This conclusion is also highly speculative. Plaintiff then further submits that the authors of the allegedly defamatory articles would have been contemplating this conversation some 15 months later when they were writing the articles and that recollection of this conversation would have caused them, when reading the grand jury report, to seriously doubt whether the report actually implicated plaintiff. Plaintiff's line of reasoning fails to take account of the possibility that during the 15-month time span evidence of additional participants might have been discovered and presented to the grand jury. This possibility would surely have been apparent to the authors of the allegedly libelous articles.

Plaintiff apparently believes that had the names of these confidential sources been disclosed prior to trial,

he could have obtained the testimony of these sources and perhaps established that the above scenario occurred. Considering the long and tenuous nature of the chain purportedly linking these sources to any relevant issue in this case—the state of mind of the allegedly defamatory authors—we find that the court did not abuse its discretion in concluding that the identity of these sources was irrelevant.

## IX. CONCLUSION

We certainly do not condone the defendants' failure to thoroughly study the grand jury report and verify that their interpretations of the report were completely accurate. Nor do we wish to understate the severe harm which plaintiff undoubtedly suffered as a result of this publicity. However, the United States Supreme Court has mandated that public officials establish actual malice when seeking damages for libelous publications regarding their official conduct. Since we find insufficient evidence to overturn the verdicts on the actual-malice issue, and since we find no other trial error which has unfairly prejudiced plaintiff, we are compelled to uphold the verdicts and affirm the appellate court's decision.

*Affirmed.*

MILLER and STAMOS, JJ., took no part in the consideration or decision of this case.