RAY DANCER, INC., Plaintiff-Appellant and Counterdefendant, v. D M C CORPORATION, Defendant-Appellee (Leisure Arts, Inc., Defendant and Counterplaintiff).

Second District   No. 2—91—0552

Opinion filed June 5, 1992.

Stanley A. Walton III and Bart A. Lazar, both of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, and Randall J. Yorke, of Naperville, for appellant.

Blake L. Harrop, of Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, and Helene D. Jaffe, of Weil, Gotshal & Manges, of New York, New York, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

This is an appeal by the plaintiff, Ray Dancer, Inc. (Dancer), from the circuit court of Du Page County's denial of leave to file a second amended complaint as to counts I, II, III and IV after dismissal with prejudice of those counts against the defendant, The D M C Corpora-

tion (DMC), alleging tortious interference with Dancer's business and contractual relationships with Leisure Arts, Inc. (Leisure), and from summary judgment entered on counts V, VI and VII of its second amended complaint alleging antitrust violations against DMC (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005). The tort counts were dismissed in 1987 but were not final and appealable until the recent disposition of the antitrust counts. Dancer voluntarily dismissed counts VIII and IX of its second amended complaint concerning packaging of its embroidery floss alleging estoppel due to detrimental reliance and waiver. Dancer previously unsuccessfully appealed in this court the dismissal of counts X, XI and XII of its complaint alleging breach of contract, misrepresentation and misrepresentation with malice. (*Ray Dancer, Inc. v. D M C Corp.* (1988), 175 Ill. App. 3d 997.) A counterclaim filed against DMC by Leisure was also voluntarily dismissed by Leisure. Accordingly, jurisdiction in this court is evident.

The primary issues are whether the court erred in denying amendment of the tort counts and granting summary judgment as to the antitrust counts.

Dancer, an importer of various home sewing and handicraft products, was seeking a national distributor to handle a line of embroidery floss (thread) for its West German manufacturer, Madeira Garn Fabrik K.G. (Madeira). To that end, Dancer contracted with Leisure to be the exclusive distributor of the Madeira line of embroidery floss.

At that time, Leisure was a principal distributor of another line of embroidery floss imported by DMC and manufactured by DMC's French parent corporation. DMC is an acknowledged giant in the embroidery floss market in the United States. Leisure's stated motivation in taking on the Madeira line of floss was to provide an alternative line of high-quality embroidery floss at a lower cost to its home-craft shop customers which could then compete more effectively with the chain discount and retail stores. Leisure planned to market the Madeira floss in a full color range using DMC's numerical color identification code system with the addition of an "LA" prefix on its own labels. Leisure believed the DMC color code numbering system to be the standard in the market; DMC color numbers were widely referenced in craft pattern chart books.

Upon learning of Leisure's plan with regard to the Madeira floss, DMC registered its objection with Leisure concerning Leisure's intention to market the Madeira floss, to use DMC's color numbers and trade dress (referring to the two black-and-gold paper bands wrapped around each end of the skein of embroidery floss) on the Madeira floss, and to permit display in some instances of the Madeira floss in

DMC's own retail display cabinets. DMC charged that Leisure's marketing plan would be unfair competition. DMC indicated to Leisure that if it proceeded with such plans, DMC would terminate its business relationship with Leisure. Leisure responded that it would proceed and that if DMC ceased its business relationship with it, Leisure would sue DMC.

DMC's subsequent termination in September 1985 of business relations with Leisure as to all of its products, not just its embroidery floss, was followed, in chronological order, by DMC's prefiling notice to Leisure on October 30 of its intent to seek a temporary restraining order in Federal district court in New York to prevent Leisure's use of DMC's color numbers or trade dress, Leisure's immediate filing that same day of its own suit against DMC in Federal district court in Little Rock, Arkansas, for antitrust violations, and the filing on October 31 of DMC's previously noticed complaint in New York alleging trademark infringement and unfair competition under Federal and State laws, and seeking emergency and permanent injunctive relief. The New York district court issued a temporary restraining order prohibiting Leisure from selling any embroidery floss bearing the DMC trade dress or color numbers and set a November 7 preliminary injunction hearing date.

Before that hearing date arrived, Leisure and DMC reached a settlement which was approved by the court on November 6, 1985. By the terms of the settlement agreement, Leisure and DMC each agreed to dismiss its action against the other with prejudice simultaneously upon execution of the agreement. *Inter alia,* Leisure agreed to refrain from distributing embroidery floss in packaging bearing trade dress which was confusingly similar to DMC's or using the DMC color numbers. The agreement expressly provided:

> "Nothing contained herein prevents Leisure Arts from selling, consigning or otherwise returning products to [Madeira], Ray Dancer or any other person or party to whom either Madeira or Ray Dancer assign their respective rights to receive such goods. *It is further agreed that nothing herein prohibits Leisure Arts from distributing or selling such products as long as they do not bear the DMC trade dress and/or DMC color numbers.*" (Emphasis added.)

DMC agreed to reinstate Leisure as a distributor of DMC products effective January 1, 1986, on the same terms and conditions and in the same manner as existed for any DMC distributor prior to Leisure's termination in September 1985.

After the settlement was reached, Leisure ceased further purchases of the Madeira embroidery floss from Dancer. Leisure's stated reasons for ceasing such purchase was (1) that neither it nor Dancer, upon request, was willing to spend the money to relabel the Madeira floss already ordered; (2) the Madeira product would be more difficult to market without the use of DMC's distinctive color numbers; and (3) initial sales of the Madeira line of floss met with an unexpected degree of resistance and sales were disappointing.

In discussions subsequent to the DMC/Leisure settlement with Leisure's president, Steve Patterson, Dancer—under the impression that Leisure was ordered as a result of the New York court proceedings *not* to buy floss from Dancer and relying strictly on Patterson's statements and without having seen any of the court documents—did not further promote the sale of Madeira floss in the United States until it later learned that there was no court ruling prohibiting its sale of the Madeira floss as it was then banded and boxed. As alleged by Dancer, Leisure's cessation of business with Dancer caused a negative cash-flow chain reaction in Dancer's business and, ultimately, Dancer dissolved in 1986. Dancer became suspicious about what really occurred in the New York lawsuit when it began to notice that Leisure was not pursuing its previously conceived plan to develop its own private label line of floss. After reading a summary of the New York court proceedings, Dancer concluded that some "backroom" deal had been struck between Leisure and DMC since, Dancer opined, Leisure would have had nothing to lose by proceeding with the injunction hearing, that is, Leisure would either be in exactly the same position it then was due to the temporary restraining order or the court would rule that Leisure could market the Madeira floss as planned. After consulting with counsel, Dancer filed the instant cause against DMC and Leisure.

## Tort Counts

We first consider whether the trial court erred in denying Dancer leave to file its second amended tort counts I, II, III and IV. On June 3, 1987, the trial court granted DMC's motion to dismiss with prejudice the tortious interference counts of Dancer's first amended complaint for failure to state a claim upon which relief could be granted. The court denied Dancer's motions for clarification and reconsideration and to file second amended tort counts. The trial court's order was not final and appealable until now, after final disposition of the remaining counts and Leisure's voluntary dismissal of its counterclaim against Dancer.

In both the first and second amended complaints, count I alleged that DMC's conduct constituted an intentional and unjustifiable interference in the pending, and future, business relationship between Dancer and Leisure. Count II alleged DMC's conduct constituted an intentional and improper interference by DMC with the performance of the contract between Dancer and Leisure by inducing, influencing, or otherwise causing Leisure not to perform the Dancer/Leisure contract. Counts III and IV charged the conduct in counts I and II, respectively, was done with malice. Dancer states the second amended complaint "additions" to the general allegations of the complaint were that (1) the settlement agreement between DMC and Leisure included "an understanding between DMC and Leisure that Leisure not carry or use or deal in Dancer floss"; (2) that DMC'S New York suit against Leisure was "a sham and in bad faith"; and (3) that the tort counts are based on "the conduct of DMC taken in the totality."

Dancer asserts that, whether or not its prior pleading stated tort counts causes of action, it believes its second amended complaint does and the court improperly refused to allow it to pursue those second amended counts. It argues that, notwithstanding Illinois' policy of liberal allowance of amendment to pleadings and the fact that its second amended complaint was only the first time the tort counts had been amended, the court's dismissal of the tort counts was not based on any failure of the counts to state a cause of action but, rather, on the court's erroneous belief that *Havoco of America, Ltd. v. Hollowbow* (7th Cir. 1983), 702 F.2d 643, warranted that result.

*Havoco* adhered to the holding of *Lyddon v. Shaw* (1978), 56 Ill. App. 3d 815, wherein the court rejected an effort to extend the tort liability for the wrongful filing of a lawsuit beyond the ambit of an action for malicious prosecution or abuse of process into a cause of action for tortious interference with business opportunity. " 'Free access to the courts as a means of settling private claims or disputes is a fundamental component of our judicial system, and "courts should be open to litigants for the settlement of their rights without fear of prosecution for calling upon the courts to determine such rights." (*Schwartz v. Schwartz* (1937), 366 Ill. 247, 250[, 8 N.E.2d 668].)' " *Havoco*, 702 F.2d at 647, quoting *Lyddon v. Shaw*, 56 Ill. App. 3d at 821-22.

Dancer argues the New York lawsuit was only part of the totality of DMC's conduct which culminated in the settlement agreement to "destroy" Dancer and, at the very least, its allegation of malice in second amended counts II and IV is sufficient to place the counts within the exception to the concept of "privileged interference" dis-

48

cussed in *Hanzel Construction, Inc. v. Wehde & Southwick, Inc.* (1985), 130 Ill. App. 3d 196, 202.

■ The question of whether to grant or deny leave to amend a complaint is within the trial court's discretion, and the court's decision will not be reversed absent an abuse of that discretion. (*People ex rel. Hartigan v. E & E Hauling, Inc.* (1991), 218 Ill. App. 3d 28, 49; *Trans World Airlines, Inc. v. Martin Automatic, Inc.* (1991), 215 Ill. App. 3d 622, 627.) The test to be applied in determining whether the trial court's discretion was properly exercised is whether allowance of the amendment furthers the ends of justice. (*E & E Hauling*, 218 Ill. App. 3d at 49; *Trans World Airlines*, 215 Ill. App. 3d at 627.) Ordinarily, amendment should not be allowed where the matters asserted were known by the moving party at the time the original pleading was drafted and for which no excuse is offered in explanation of the initial failure. *Hall v. Northwestern University Medical Clinics* (1987), 152 Ill. App. 3d 716, 723.

We see no abuse of the court's discretion in not allowing Dancer to pursue its second amended tort counts where Dancer's additions added no new facts to the complaint, only conclusions unsupported by specific facts.

■ ■ In order to state a cause of action for tortious interference with contract, it must be alleged that (1) there was a valid, enforceable contract between the plaintiff and another; (2) the defendant was aware of this contractual relationship; (3) the defendant intentionally and unjustifiably induced a breach of contract; (4) a breach of the contract occurred as a result of the defendant's wrongful acts; and (5) damage to the plaintiff. (*Trans World Airlines*, 215 Ill. App. 3d at 626; *Madonna v. Giacobbe* (1989), 190 Ill. App. 3d 859, 867-68.) A cause of action for tortious interference with a business expectancy requires allegations that (1) plaintiff had a valid business expectancy; (2) defendant had knowledge of the expectancy; (3) the defendant intentionally interfered with the prospective business relationship and prevented its realization; and (4) resultant damage to the plaintiff. (*Madonna*, 190 Ill. App. 3d at 867; see also *Fellhauer v. City of Geneva* (1991), 142 Ill. 2d 495, 511.) Factual allegations supporting every fact that must be proved in order for plaintiff to be entitled to a judgment in his or her favor must be contained in the complaint, or it will fail to state a cause of action. *Madonna*, 190 Ill. App. 3d at 865.

■ In intentional interference with contract cases, a defendant is "privileged" to cause a breach of another's contract if his acts in doing so were lawful, not unreasonable under the circumstances, and if he acts to preserve a conflicting interest which the law deems to be of

equal or greater value than the contractual rights at issue. (*Hanzel Construction, Inc. v. Wehde & Southwick, Inc.* (1985), 130 Ill. App. 3d 196, 202.) For instance, a privilege exists in favor of corporate officers and directors to use their best business judgment and discretion on behalf of their corporations. (*Swager v. Couri* (1979), 77 Ill. 2d 173, 190-91.) The privilege does not obtain, however, if the defendant acted with malice in interfering with the contractual relation. (*Hanzel*, 130 Ill. App. 3d at 202.) An allegation of malice to overcome a defendant's privilege to interfere must convey that there was more than ill will. The facts alleged must show that there was " 'a desire to harm, which is independent of and unrelated to a desire to protect the acting party's rights and which is not reasonably related to the defense of a recognized property or social interest.' " *Havoco*, 702 F.2d at 649, quoting *Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill. 2d 546, 551; *Hanzel*, 130 Ill. App. 3d at 202.

■ Considering the "totality" of DMC's conduct as alleged in Dancer's second amended complaint (including DMC's "threat" to discontinue doing business with Leisure, its discontinuance of the sale of any of its products to Leisure, its New York lawsuit, and the "understanding" included in its settlement agreement with Leisure), there is nevertheless an absence of facts which show a desire to harm Dancer which was unrelated to DMC's desire to protect its right to its own color-code numbering system and trade dress by discontinuing its own business relationship with Leisure and seeking to enjoin Leisure's use of such color-code system and trade dress in marketing a competitor's floss. *Cf. Philip I. Mappa Interests, Ltd. v. Kendle* (1990), 196 Ill. App. 3d 703 (plaintiff's amended complaint alleging tortious interference with contractual relationship and prospective economic advantage properly dismissed for failure to state a cause of action where facts alleged indicated that actions taken by defendants were directly related to their effort to protect their real estate property interest).

Inasmuch as Dancer's proposed second amended complaint did not obviate the defects of its prior complaint, we conclude the court did not abuse its discretion in denying it leave to file the second amended tort counts.

## SUMMARY JUDGMENT

We next consider Dancer's contention that the court erred in granting DMC's renewed motion for summary judgment as to Dancer's counts V, VI and VII alleging antitrust violations. Preliminarily, we note that because the subsections of the Illinois statute

upon which these counts are based, section 3 of the Illinois Antitrust Act (the Act) (Ill. Rev. Stat. 1989, ch. 38, pars. 60—3(3), (4)), are analogous, respectively, to section 2 of the Sherman Act (15 U.S.C. §2 (1988)) and section 3 of the Clayton Act (15 U.S.C. §14 (1988)), it is appropriate to construe them in accord with Federal law and precedents. (*State of Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.* (7th Cir. 1991), 935 F.2d 1469; *Maywood Sportservice, Inc. v. Maywood Park Trotting Association, Inc.* (1973), 14 Ill. App. 3d 141.) Also, the usual summary judgment standard of review applies: the motion shall be granted where the pleadings, depositions, admissions and exhibits reveal that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c); *Carruthers v. B.C. Christopher & Co.* (1974), 57 Ill. 2d 376.

Contrary to Dancer's argument, there is no heightened standard for summary judgment in antitrust cases. (See *Lupia v. Stella D'Oro Biscuit Co.* (7th Cir. 1978), 586 F.2d 1163, 1167.) Although the usual caveat to use summary judgment sparingly in cases where questions of motive and intent are foremost remains valid (*Lupia*, 586 F.2d at 1166), summary judgment is still appropriate when it is clear that the plaintiff will be unable to establish an element of a claim and, thus, a trial would serve no useful purpose. (*Magid Manufacturing Co. v. U.S.D. Corp.* (N.D. Ill. 1987), 654 F. Supp. 325, 327-28; *Solomon v. Houston Corrugated Box Co.* (5th Cir. 1976), 526 F.2d 389, 393-94.) The trial court's summary judgment may be affirmed on any basis appearing in the record whether or not the court relied on that basis or its reasoning was correct. *Schaumburg State Bank v. Bank of Wheaton* (1990), 197 Ill. App. 3d 713; *Coleman v. Windy City Balloon Port, Ltd.* (1987), 160 Ill. App. 3d 408.

Dancer does not dispute the additional rule pointed out by DMC that a plaintiff seeking to establish the existence of an alleged antitrust conspiracy solely through circumstantial evidence, as here, would have to satisfy the high "clear and convincing" standard of proof at a trial on the merits (*Bosak v. McDonough* (1989), 192 Ill. App. 3d 799, 804), which standard is necessarily implicated when the court rules on a motion for directed verdict or summary judgment (*Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 255, 91 L. Ed. 2d 202, 216, 106 S. Ct. 2505, 2514; *Reed v. Northwestern Publishing Co.* (1988), 124 Ill. 2d 495, 512). That is, in determining whether a "genuine" issue of material fact exists in the instant cause, we must consider whether a fact finder applying the "clear and convincing" evidentiary standard as to the conspiracy count or the "preponderance of the evidence" standard

as to the monopoly counts (*State of Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.* (C.D. Ill. 1990), 730 F. Supp. 826, 925) could reasonably find for *either* Dancer or DMC as opposed to finding that the evidence is so one-sided that one of those two must prevail as a matter of law (*Anderson*, 477 U.S. at 252, 255, 91 L. Ed. 2d at 214, 216, 106 S. Ct. at 2512, 2513-14).

■ The elements Dancer needed to prove in order to establish a violation of subsection 3(4) of the Act (count V—exclusive dealing) were: (1) that DMC and Leisure entered into an express or implied agreement that Leisure would not carry a line of floss competitive with DMC's and (2) that such an agreement was likely to have a substantial anticompetitive effect on the market. (*Roland Machinery Co. v. Dresser Industries, Inc.* (7th Cir. 1984), 749 F.2d 380, 392.) "The objection to exclusive-dealing agreements is that they deny outlets to a competitor during the term of the agreement." *Roland Machinery Co.*, 749 F.2d at 393.

■ Clearly, the settlement agreement entered into between DMC and Leisure in the New York litigation is not itself an exclusive-dealing agreement. The settlement agreement expressly provides that Leisure may distribute other brands of floss, including Madeira, so long as such floss does not bear the DMC trade dress or color numbers. Dancer relies, therefore, on the "understanding" it says arose from language in a letter from DMC'S president to Leisure's president welcoming Leisure back as a DMC distributor shortly after their settlement agreement had been reached. The "best efforts" language which Dancer asserts raised the understanding of an exclusive-dealing agreement was as follows:

> "You have requested that we provide you with some assurance of supply of DMC products in the future. As we explained to you, we do not have contracts with our distributors and naturally would not want to vary this practice for one distributor.
>
> However, in consideration of our resolution of the litigation, we want you to know that we will supply you with DMC products, as we have in the past, on our standard terms and conditions, for a period of no less than one year. This willingness on our part to supply you is, of course, conditioned on our normal relationship with distributors, which assumes normal terms of dealing, including full payment of all appropriate invoices in a timely manner, purchases within normal credit limitations, *and exercising your best efforts in the purchase, inventorying, distribution, promotion and selling of DMC products.*" (Emphasis added.)

Dancer's argument that this language implies an exclusive-dealing agreement between DMC and Leisure not only is contrary to the express terms of the settlement agreement reached in the New York litigation, but also is refuted by evidence that a number of DMC's 20 or so distributors do carry other lines of embroidery floss and by evidence that Leisure itself ultimately also carried another line of embroidery floss from Coates & Clark after the settlement agreement was reached.

■ Dancer argues that the mere fact that Leisure stopped purchasing floss from Dancer when it resumed dealing with DMC is sufficient circumstantial evidence from which an exclusive-dealing agreement may be inferred. In order to withstand a motion for summary judgment, however, an antitrust plaintiff relying on circumstantial evidence must present evidence from which an inference of conspiracy is more probable than an inference of independent action. (*First National Bank v. Cities Service Co.* (1968), 391 U.S. 253, 277-80, 20 L. Ed. 2d 569, 585-87, 88 S. Ct. 1575, 1586-88; see also *Trowbridge Farm Supply Co. v. W.R. Grace & Co.* (1980), 82 Ill. App. 3d 1140, 1144, quoting *Tribune Co. v. Thompson* (1930), 342 Ill. 503, 529 (" '[I]f the facts and circumstances relied upon [to prove an antitrust conspiracy] are as consistent with innocence as with guilt it is the duty of the court to find that the conspiracy has not been proved' ").) Where the moving party has filed a properly supported motion for summary judgment, the nonmoving party must come forward with direct or circumstantial evidence which reasonably tends to prove that the parties had a "conscious commitment to a common scheme designed to achieve an unlawful objective." (*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.* (3d Cir. 1980), 637 F.2d 105, 111.) "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial. [Citation.]' " *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.* (1986), 475 U.S. 574, 587, 89 L. Ed. 2d 538, 552, 106 S. Ct. 1348, 1356.

Leisure's president testified unequivocally that Leisure made an independent decision to stop marketing Madeira floss. A primary reason for the decision was that Leisure was foreclosed by its settlement agreement with DMC from using DMC's color numbers; the use of DMC's numbers was to be a major component of Leisure's hopefully successful marketing plan for the Madeira floss. Another reason was that Leisure did not want to spend the money to relabel the Madeira floss it already had ordered, and Dancer was not willing to undertake relabeling, either. Leisure's third reason for discontinuing Madeira was the unexpected sales resistance it encountered to the Madeira floss,

due partly to the more subdued sheen of the Madeira floss compared with DMC's. A termination of business relations is insufficient to support an inference of antitrust conspiracy, and summary judgment is properly granted where the nonmoving party's evidence either does not exclude, or is equally as consistent with, independent action as opposed to conspiracy. See *Dunnivant v. Bi-State Auto Parts* (11th Cir. 1988), 851 F.2d 1575; *Valley Liquors, Inc. v. Renfield Importers, Ltd.* (7th Cir. 1987), 822 F.2d 656, 660-65.

Based on the evidence, we conclude there is no genuine issue of material fact concerning the existence of an exclusive-dealing agreement between DMC and Leisure and find that the trial court did not err in entering summary judgment on count V. In light of our finding, it is unnecessary for us to consider the second required element of proof of exclusive-dealing, that is, whether the alleged agreement was likely to have a substantial anticompetitive effect on the market. Accordingly, we proceed to consider whether the summary judgment was proper as to counts VI and VII.

Counts VI (actual monopoly) and VII (attempted monopoly) claim violations of subsection 3(3) of the Act, which subsection is analogous to section 2 of the Sherman Act (15 U.S.C. §2 (1988)). Subsection 3(3) prohibits establishing, maintaining, using, or attempting to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce. (Ill. Rev. Stat. 1989, ch. 38, par. 60—3(3).) A claim of monopolization (count VI) is shown by establishing by a preponderance of the evidence (*State of Illinois ex rel. Hartigan v. Panhandle Eastern Pipe Line Co.* (C.D. Ill. 1990), 730 F. Supp. 826, 925) (1) that the defendant possesses "monopoly power" (*i.e.*, the power to control output and prices) in a relevant market, and (2) that the defendant has engaged in improper conduct designed to acquire or maintain that power (*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.* (7th Cir. 1986), 797 F.2d 370, 373) as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident (*United States v. Grinnell Corp.* (1966), 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 786, 86 S. Ct. 1698, 1703-04). A claim of attempted monopolization (count VII) is shown by establishing by a preponderance of the evidence that (1) the defendant had a specific intent to monopolize; (2) the defendant engaged in predatory or anticompetitive conduct directed at accomplishing the unlawful purpose; and (3) a dangerous probability of success. *Lektro-Vend Corp. v. Vendo Co.* (7th Cir. 1981), 660 F.2d 255, 269-70.

The intent to achieve or maintain a monopoly is no more unlawful than the mere possession of a monopoly; the intent relevant to a monopoly claim under the Sherman Act is intent to maintain or achieve monopoly power by anticompetitive means. (*State of Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.* (7th Cir. 1991), 935 F.2d 1469; *Olympia Equipment Leasing Co.*, 797 F.2d at 374.) "[T]he defendant must be shown to have utilized its dominant position in [the] market to control prices, exclude competition, or engage in other methods of unfair competition." Ill. Ann. Stat., ch. 38, par. 60—3, Historical & Practice Notes, at 463 (Smith-Hurd 1977).

We find no merit in Dancer's position that it need only show the existence of DMC's monopoly power and that the burden then shifts to DMC to prove that its power derives solely from a superior product, business skill, natural advantages, economic efficiency, technological efficiency, or historic accident. Dancer's burden-shifting concept emanates from the now-discredited *Alcoa* line of cases which no longer represents the current state of Federal antitrust law. (*Olympia Equipment Leasing Co.*, 797 F.2d at 375, referring to *United States v. Aluminum Co. of America* (2d Cir. 1945), 148 F.2d 416.) A company with lawful monopoly power need not exercise special restraint in order to encourage new entrants; rather, it may defend its monopoly power by legitimate tactics and has no general duty to help its competitors. (*Olympia Equipment Leasing Co.*, 797 F.2d at 375.) Thus, when DMC filed its properly supported motion for summary judgment, Dancer bore the burden of coming forward with evidence that DMC abused its monopoly power as prohibited in section 3(3) of the Act.

Assuming, *arguendo*, as did the trial court below, that DMC's monopoly power may be inferred from its share of the embroidery floss market, the conduct which Dancer relies upon in both counts VI and VII to show DMC's abuse of its monopoly power is, once again, the New York litigation.

There is a doctrine known as the *Noerr-Pennington* doctrine which was drawn from *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.* (1961), 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523, and *United Mine Workers of America v. Pennington* (1965), 381 U.S. 657, 14 L. Ed. 2d 626, 85 S. Ct. 1585. That doctrine holds that *bona fide* attempts to influence the actions of a legislative body are immune from antitrust scrutiny regardless of any anticompetitive motives behind those attempts. *Noerr-Pennington* immunity has been extended to include good-faith attempts to secure legitimate goals through the

use of the courts. See *California Motor Transport v. Trucking Unlimited* (1972), 404 U.S. 508, 30 L. Ed. 2d 642, 92 S. Ct. 609.

A very narrow "sham" exception to the *Noerr-Pennington* doctrine provides that the bringing of a lawsuit may be the predicate for antitrust liability when it can be shown, by clear and convincing evidence, that the purpose of the suit is to harm a competitor, not by the results sought, but by the very process of the litigation itself. (*Winterland Concessions Co. v. Trela* (7th Cir. 1984), 735 F.2d 257, 263-64; *Grip-Pak, Inc. v. Illinois Tool Works, Inc.* (7th Cir. 1982), 694 F.2d 466, 472; *City of Gainesville v. Florida Power & Light Co.* (S.D. Fla. 1980), 488 F. Supp. 1258, 1265-66.) For example, in *Winterland*, the court found Trela's counterclaim stated a cause of action against Winterland under the sham exception. Winterland manufactured, distributed and retailed T-shirts bearing the names, likenesses, and logos of individual performers and musical groups with whom it had exclusive licensing arrangements. Most of its sales were made at concerts given by its licensors. Trela similarly designed and sold specialty T-shirts of various of Winterland's licensors but without authorization. Winterland's complaint against such "bootleggers," including Trela, was countered by Trela's claim that Winterland's use of the courts violated antitrust law in that Winterland repeatedly sought and obtained "John Doe" *ex parte* restraining orders intended to restrain Trela's T-shirt operation even though it knew Trela's identity. Further, Winterland purposely delayed filing actions until the day before a licensor's performance and repeatedly dismissed such actions against Trela after the concert was over and his T-shirts had little market value. Trela alleged that by these means, Winterland was able to avoid adjudication of the merits of its property rights while at the same time eliminating him as a competitor during performances. *Winterland*, 735 F.2d at 263.

Admittedly, litigation which has a colorable basis can nonetheless violate antitrust law; "[t]he line is crossed when [the] purpose is not to win a favorable judgment against a competitor but to harass him, and deter others, by the process itself—regardless of outcome—of litigating." *Grip-Pak, Inc.*, 694 F.2d at 472.

Although technically there was no adjudication on the merits of DMC's injunctive suit against Leisure, the court-approved settlement wherein DMC basically achieved the injunctive relief it sought in its suit—while expressly leaving Leisure free to deal with Dancer—militates against a finding that DMC's suit was merely a "sham." (*Cf. Original Appalachian Artworks, Inc. v. McCall Pattern Co.* (N.D. Ga. 1985), 1986-1 Trade Cas. (CCH) par. 67,014, at 62,236-38 (summary judgment appropriate where counterplaintiff's attempted monopoliza-

tion claim against counterdefendant was based on one prior lawsuit by counterdefendant against counterplaintiff which rendered a result entirely favorable to counterdefendant where the court granted it a preliminary injunction against counterplaintiff, counterplaintiff paid $200,000 in settlement to counterdefendant, and court issued permanent injunction against counterplaintiff).) Further, contrary to Dancer's assertion, the deposition excerpts and documents in the record do not show that DMC's main concern was solely with the fact that Leisure intended to market Madeira's competing floss. Rather, DMC's letter in August to Leisure warning of its intent to terminate relations with Leisure was founded on its belief that:

"Leisure Arts will [not] be able to fairly or adequately represent DMC products while at the same time carrying a line of product *which attempts to trade on our goodwill by utilizing our color codes and imitating our marketing system and presentation.*" (Emphasis added.)

Leisure Arts executive Barnett stated in his deposition that DMC president Wallaert "was upset that we were marketing the [Madeira] floss, [but he] was *more* upset that we were marketing a floss with his numbers on it and he was *equally* upset about the use of his cabinets for that floss." (Emphasis added.) In fact, the parties' settlement agreement expressly allowing Leisure to sell a competitive line of floss is qualified by certain restrictions on banding and colors. For instance, black-and-gold wrappers were not to be used on a skein of embroidery floss unless the wrapper set forth a trade name that was not confusingly similar to DMC, the trade name was the most prominent feature on the wrapper and the DMC color numbers did not appear on the wrapper.

Viewing the record as a whole, we conclude a fact finder could not reasonably find there is clear and convincing evidence that DMC's injunction suit against Leisure fell within the sham exception to the *Noerr-Pennington* doctrine. Consequently, Dancer would be unable to establish at trial the element of its monopoly and attempted monopolization claims that DMC's conduct was improper under the Act. Accordingly, summary judgment was properly granted by the circuit court of Du Page County. *Magid Manufacturing Co. v. U.S.D. Corp.* (N.D. Ill. 1987), 654 F. Supp. 325, 327-28.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

GEIGER and NICKELS, JJ., concur.