2025 IL App (1st) 241723-U

No. 1-24-1723

Third Division
June 25, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| | ) | |
| AMANDA CROUCHER, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellant, | ) | |
| | ) | No. 22 L 65026 |
| v. | ) | |
| | ) | The Honorable |
| THE VILLAGE OF LA GRANGE, | ) | Thomas Murphy (ret.) and |
| | ) | Matthew J. Carmody, |
| Defendant-Appellee. | ) | Judges Presiding. |
| | ) | |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held:*  The circuit court's grant of summary judgment is affirmed, as the defendant municipality owed no duty to plaintiff where the sidewalk condition causing plaintiff's injury was open and obvious.

¶ 2    Plaintiff Amanda Croucher was injured when she tripped over an uneven sidewalk slab in La Grange, Illinois, which had been repaired with an asphalt patch. Plaintiff filed a lawsuit against the defendant Village of La Grange (Village), alleging that the Village was negligent in its failure to maintain the sidewalk, and seeking damages for her injuries. The Village filed a motion for summary judgment, which was initially denied, but on a motion to reconsider, the

circuit court granted summary judgment in the Village's favor, finding that the condition of the sidewalk was open and obvious. Plaintiff now appeals and, for the reasons that follow, we affirm.

¶ 3                                                    BACKGROUND

¶ 4         The basic facts in the instant case are largely undisputed, except as discussed further below. At approximately 10:30 a.m. on April 10, 2022, plaintiff was on a morning run, running through the streets of the Village. While running north on the 1000 block of Brainard Avenue, a residential street, plaintiff briefly glanced to her right to ensure that no vehicle was leaving the nearby driveway. While doing so, plaintiff tripped on an uneven sidewalk slab, which had previously been repaired using an asphalt patch, and fell, injuring her knee. While plaintiff was alone, her fall was witnessed by a passing motorist, who stopped to render aid. Plaintiff was treated at the scene by paramedics, after which she was transported to the hospital.

¶ 5                                                     *Complaint*

¶ 6         On June 24, 2022, plaintiff filed a complaint against the Village, alleging that the Village owed her a duty to maintain the sidewalk in reasonably safe condition and to exercise reasonable care in the remedy, repair, and maintenance of the sidewalk. Plaintiff further alleged that the Village had breached its duty in (1) allowing an unreasonably dangerous condition on the sidewalk to remain on the premises for an unreasonable period of time, (2) failing to warn plaintiff of the condition, and (3) failing to ensure the repair of the condition. Plaintiff alleged that the Village's negligence had caused her injuries "of a personal, pecuniary, and permanent nature."

¶ 7         The Village filed an answer and affirmative defenses, admitting that it had knowledge of the patch of asphalt on the sidewalk, but denying that it represented an unreasonably dangerous

2

condition. The Village also raised affirmative defenses of contributory negligence and immunity under section 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/2-201 (West 2022)).

¶ 8                                                    *Discovery*

¶ 9        The parties engaged in extensive discovery, which included plaintiff's answers to interrogatories, as well as depositions from plaintiff, an eyewitness to her fall, a Village police officer, and several Village employees. As relevant to the instant appeal, the evidence from discovery established the following.

¶ 10       Carolyn Achepohl testified that Sunday, April 10, 2022, was a sunny day, with no clouds and no rain. She was driving northbound along Brainard Avenue between 10 and 10:30 a.m. when she observed plaintiff running along the sidewalk on the east side of the street. Achepohl then observed plaintiff fall and, when she failed to rise to her feet, Achepohl pulled over to the side of the road to offer assistance; Achepohl parked her vehicle slightly north of the scene of plaintiff's fall, and walked south to meet plaintiff. When she approached plaintiff, she asked if plaintiff was all right, but plaintiff indicated that she believed she had dislocated her knee. At plaintiff's request, Achepohl dialed 911, and paramedics arrived after approximately five minutes.

¶ 11       While waiting for the paramedics to arrive, Achepohl chatted with plaintiff, who indicated that she had been out for a run to enjoy the weather and that "she should have been looking at the sidewalk and not looking at the houses when she was running." Plaintiff also pointed out the area of the sidewalk where she believed she tripped, and Achepohl testified that, while she did not notice it when initially walking to assist plaintiff, "it was noticeable then that there was pavement that was raised." Achepohl testified that there was an asphalt strip spanning the width

of the sidewalk, and identified several photos of the asphalt which were presented to her by counsel.

¶ 12    The photos, which are included in the record on appeal, depict the sidewalk area in which plaintiff fell.[1] The first photo, which is taken facing east, depicts several sidewalk slabs in front of a residence. The sidewalk slab which begins at the south end of the residence's driveway, while even in height with the slab to its north, is noticeably higher than the slab directly to its south. A tree in the yard is casting shadows over the sidewalk. The next photo, taken facing northeast, provides a view of the same sidewalk area. From this angle, the photo depicts a strip of dark asphalt running the width of the sidewalk, which connects the higher slab with the lower slab; the asphalt strip appears to be several inches wide. Again, the nearby tree is casting shadows over the sidewalk, but the asphalt strip is still visible. The third photo, which is a closeup of the asphalt strip, reveals that the strip is in the shape of a ramp, with the asphalt tapering from the higher slab to the lower slab, covering any sharp drop in elevation between the slabs. Finally, the fourth photo is taken facing north, and again depicts the sidewalk area. As with the other photos, there are shadows falling across the sidewalk, but the asphalt strip is visible.

¶ 13    Achepohl testified that the photos truly and accurately depicted the sidewalk as it appeared to her on the morning of plaintiff's fall, and further testified that the asphalt patch "was very visible" at the time; she did not initially observe it since she was walking toward plaintiff from

---

[1] As discussed further below, these photos were taken by the police officer responding to the scene. While the actual photos were not provided to this court, the record on appeal contains reproductions of the photos, used by the parties in the course of the summary judgment proceedings. The four photos described were used by the Village's attorney in depositions; while plaintiff provided the entire series of 20 photos, they are of considerably poorer quality. There is no dispute, however, that the four photos are part of the series of photos taken by the officer, and that they accurately depict the area in which plaintiff fell.

the north. Achepohl testified that there were shadows from nearby trees falling upon the sidewalk, but that, examining the photos, "[t]o me, I can still see the asphalt there even with" the shadows.

¶ 14    In her deposition, plaintiff testified that, immediately prior to her fall, she had been "checking [her] surroundings" and glanced toward the driveway to her right to ensure there was no vehicle backing out of the driveway. Once she turned her head back to face forward, "[her] left foot was already caught." After she fell, she looked around the area to determine the cause of her fall, and determined that she had gotten her foot caught on the uneven pavement, which she estimated to be three to four inches in height difference; she did not notice it prior to her fall. Plaintiff, however, believed that even if she had been looking down immediately prior to her fall, she would not have noticed the sidewalk defect due to the shadows from the nearby tree, as "it was kind of hard to even see it without actually being right there." Plaintiff nevertheless admitted that she was "right there" when she fell, and that she would have been able to observe it when she was standing over it. Plaintiff further testified that she was not distracted at the time of her fall. Due to the fall, plaintiff testified that she required knee surgery to repair all four ligaments in her knee, and was informed that she "[had] stage 4 damaged cartilage."

¶ 15    Village police officer[2] Candice Cassiberry testified that she responded to the scene of the fall after the 911 call. When she arrived, fire department personnel were already on the scene, with paramedics having placed plaintiff inside an ambulance. The fire department personnel pointed Cassiberry toward the defect which plaintiff claimed caused her fall, and Cassiberry

_____

[2] While she was a patrol officer at the time of plaintiff's fall, Cassiberry was promoted to detective shortly before being deposed.

had no difficulty ascertaining where the defect was located. Per department procedure, Cassiberry photographed the scene, placed orange safety cones near the defect, and contacted the public works department; Cassiberry testified that her photographs would have been taken within a half hour of plaintiff's fall. When asked whether the shadows being cast by the nearby tree made it more difficult to recognize the asphalt patch in the photographs, Cassiberry responded, "I suppose," but further testified that she did not have any trouble identifying the asphalt patch through the shadows when she photographed it.

¶ 16    Russell Davenport, assistant public works director for the Village, testified that police contacted him shortly after 11 a.m. to report plaintiff's fall. Davenport arrived at the scene, where he assessed the asphalt patch between the two sidewalk slabs. He testified that, had the police not placed safety cones on the scene, he would have done so, and that the safety cones drew his attention to the asphalt patch. He further testified, however, that the shadows being cast from the trees did not make it more difficult to observe the asphalt, and that the asphalt was darker in color than the shadows. As he did not have a tape measure with him at the time, he returned the next day to measure the height differential between the two slabs, which measured from a minimum of 2¼ inches to a maximum of 2½ inches. He also took photographs and prepared a report of his findings, indicating that he had "taken pictures of trip *** hazard"; he explained that he used the term "trip hazard" to refer to the uneven sidewalk slabs, not the asphalt patch which had been used to repair the defect.

¶ 17    Davenport also testified about the Village's procedures concerning sidewalk repair. He testified that, unless a property owner was enrolled in the "50/50 sidewalk program," all repairs to public sidewalks were performed by Village public works personnel. Under the 50/50 sidewalk program, a property owner agreed to pay for 50% of the cost of sidewalk repairs near

their home, and such work was contracted to an outside contractor through a bidding process. Outside contractors were also used when performing street improvements such as street resurfacing, during the course of which nearby sidewalks would also be replaced if necessary. Davenport testified that the property adjacent to the sidewalk where plaintiff fell was not enrolled in the 50/50 sidewalk program, nor had the 1000 block of Brainard Avenue been the subject of road improvements since 2009, so any repairs would have been performed by public works employees.

¶ 18    Davenport testified that, when there were uneven slabs of sidewalk measuring over two inches, repair was possible using a "cold patch," which was the same type of material used in repairing potholes on streets. The asphalt used in applying the cold patch would be placed in a ramp-like shape, tapering from one slab to the other. The uneven slabs would not be replaced altogether unless the property owner was enrolled in the 50/50 sidewalk program or there were repairs to the adjacent street. Defects measuring less than two inches would not be repaired using a cold patch, as the asphalt would not adhere to the surface.

¶ 19    Davenport did not have any personal knowledge as to when the asphalt patch at issue was placed, and there was no work order concerning its placement in the Village's computer system. He did, however, testify that it was likely to have been a public works employee, as outside contractors were not permitted to place cold patches. While such projects were typically memorialized in work orders, as they came in response to resident complaints, that would not be the case if a worker was working in the area and took the initiative to perform the repair upon noticing the defect. Davenport testified that a former employee, Willie Roberson, would likely be the employee doing such repairs, as he was the "customer service guy" for the Village who carried a cold patch kit in his vehicle; Roberson had passed away a

few weeks prior to Davenport's deposition. While Davenport could not testify with "100 percent certainty" that Roberson had performed the repair, he testified that "[i]f anyone [had] done it, it would be him." He also identified a similar patch in a Google Earth photo of the area from September 2019, suggesting that a patch had been in place since at least that time. When asked how many workers between 2012 and 2018 could have performed the sidewalk repair at issue, he testified, "[m]an, if I was to think about it, I would just have to put it all on [Willie]."

¶ 20     Richard Colby, director of the Village's public works department, testified consistently with Davenport concerning the Village's policies. He further testified that, based on Google Earth images, the asphalt patch was placed some time between May 14, 2014, and August 31, 2018. When asked why an asphalt patch would be utilized in this type of situation, he explained that, when there was a defect, the department of public works would take action to address it to mitigate and resolve any potential hazard. The first step was to "try to figure out the right approach," which involved "kind of quite a bit of judgment," as there were different approaches which could be used for different types of defects. He explained that, in some cases, a cold patch with ramping was the best approach, while in others, the sidewalk needed to be shaved to level the surface or other material needed to be added to the side of the slab. Colby testified that, as with a filling a pothole, "[t]here is a level of technical judgment that's applied" in order to "take something that was a hazard and create some sort of transition in elevation to reduce the hazard or eliminate it."

¶ 21                              *Motion for Summary Judgment*

¶ 22     On October 6, 2023, the Village filed a motion for summary judgment, arguing that it did not owe plaintiff a duty to protect against an open and obvious sidewalk condition. The Village

further argued that the decision to use asphalt to repair the sidewalk defect was subject to discretionary immunity under section 2-201 of the Tort Immunity Act.

¶ 23    In response, plaintiff contended that summary judgment was inappropriate. She first claimed that there was a question of fact as to whether the sidewalk defect was open and obvious, given the presence of shadows from nearby trees at the time of her fall. Plaintiff further contended that, even if it was open and obvious, the Village still owed her a duty, as injury was foreseeable and remedying it was inexpensive. In response to the Village's argument concerning immunity, plaintiff claimed that the Village failed to meet its burden to establish its entitlement to immunity and that the task of placing the cold patch was ministerial.

¶ 24    After a lengthy hearing, the circuit court ultimately denied the Village's motion for summary judgment on February 16, 2024. In its order, the circuit court found that "a genuine issue of material fact remains regarding the visibility of the sidewalk deviation, whether the sidewalk deviation was open and obvious, and if Plaintiff was distracted by safety concerns at the time of her injury." The circuit court additionally found that there were genuine issues of material fact concerning the Village's claim of immunity, as a repair was generally considered a ministerial act and "[a] question remains whether the handling of the sidewalk deviation" was a discretionary or ministerial function.

¶ 25                    *Village's Motion to Reconsider*

¶ 26    On April 19, 2024, the Village filed a motion to reconsider the denial of its motion for summary judgment, claiming that the circuit court misapplied the law and overlooked key facts when finding that there was a question of fact as to the visibility of the asphalt patch. The Village additionally argued that the circuit court misapplied the law when it found that the repair of a sidewalk was a ministerial act.

¶ 27        After a hearing on the matter, on June 28, 2024, the circuit court entered an order granting the Village's motion to reconsider and further granting its motion for summary judgment. The circuit court found that the condition of the sidewalk was open and obvious, and that the asphalt patch was visible even with shadows present. The circuit court further noted that plaintiff admitted that she was not looking at the sidewalk at the time of her fall, so any shadows would not have affected her ability to appreciate the potential hazard, and found that her actions in checking her surroundings did not constitute a distraction. The circuit court additionally observed that, typically, a plaintiff would introduce an expert opinion to establish that the repair at issue was not done properly, but plaintiff failed to introduce any evidence in the instant case that the asphalt patch was not an appropriate form of repair or that it was incorrectly performed. The circuit court ultimately found: "Upon further review, this Court concludes that the mere fact of looking elsewhere does not constitute a distraction exception to the open and obvious rule, and that the cold patch repair done by the Village was not improper. This Court believes that Plaintiff has failed to meet [her] burden at this stage to show there is an issue of material fact as to overcoming the open and obvious defense that Defendant has raised."

¶ 28                              *Plaintiff's Motion to Reconsider*

¶ 29        On July 25, 2024, plaintiff filed a motion to reconsider the grant of summary judgment, contending that the original denial of the motion was proper, as there remained questions of fact about the visibility of the sidewalk defect. Plaintiff further claimed that the circuit court failed to determine if the Village owed a duty even if the defect was open and obvious. Plaintiff additionally contended that the circuit court's findings as to the adequacy of the repair went to the element of breach, not duty, and was properly a question for the jury.

¶ 30    On August 9, 2024, the circuit court denied plaintiff's motion. The circuit court noted that the judge who had initially presided over the matter retired on July 1, 2024, a few days after granting the Village's motion to reconsider. While the circuit court acknowledged that a successor judge had the authority to rule on a motion to reconsider a prior judge's ruling, it found that such an action was not appropriate in this type of case, where the motion to reconsider was challenging the prior judge's ruling on a *motion to reconsider* its own prior ruling. The circuit court found that, "[a]s the successor to [the prior judge], this court does not find that it should act as a reviewing court when all issues, facts and law regarding the prior motions have been briefed, argued and written rulings and orders entered. Pursuant to Supreme Court Rule 301, the filing of a notice of appeal of the summary judgment order is the proper initiation and continuation of this proceeding."

¶ 31    Plaintiff timely filed a notice of appeal, and this appeal follows.

¶ 32                                    ANALYSIS

¶ 33    On appeal, plaintiff contends that the circuit court erred in granting summary judgment in favor of the Village. A circuit court is permitted to grant summary judgment only if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2022). The circuit court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a circuit court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

¶ 34     Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt. *Id.* However, mere speculation, conjecture, or guess is insufficient to withstand summary judgment. *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively demonstrating that some element of the case must be resolved in his favor or by establishing that there is an absence of evidence to support the nonmoving party's case. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The purpose of summary judgment is not to try an issue of fact but to determine whether a triable issue of fact exists. *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (citing *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the circuit court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 35     In this case, plaintiff's complaint alleged that the Village was negligent in its maintenance of the sidewalk where she fell. To properly state a cause of action for negligence, a plaintiff must establish that the defendant owed a duty of care, the defendant breached that duty, and the plaintiff suffered an injury proximately caused by the breach. *Wojdyla v. City of Park Ridge*, 148 Ill. 2d 417, 421 (1992). The question of whether a duty of care exists is a question of law to be determined by the court. *Id.*

¶ 36     In determining whether a duty of care exists, courts generally consider four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the

defendant. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 18. The weight to be given to these factors depends on the circumstances of each particular case. *Id.*

¶ 37		Local public entities have a common-law duty to maintain public property in a reasonably safe condition, which has been codified in section 3-102(a) of the Tort Immunity Act. *Monson v. City of Danville*, 2018 IL 122486, ¶ 24. Generally, however, "a party who owns or controls land is not required to foresee and protect against an injury if the potentially dangerous condition is open and obvious." *Rexroad v. City of Springfield*, 207 Ill. 2d 33, 44 (2003). Our supreme court has explained that " '[o]bvious' denotes that 'both the condition and the risk are apparent to and would be recognized by a reasonable [person], in the position of the visitor, exercising ordinary perception, intelligence, and judgment.' " *Deibert v. Bauer Brothers Construction Co.*, 141 Ill. 2d 430, 435 (1990) (quoting Restatement (Second) of Torts, § 343A, comment *b*, at 219 (1965)); *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 16.

¶ 38		In cases involving open and obvious conditions, the law generally assumes that individuals who encounter such a condition will take care to avoid any danger inherent in the condition. *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 448 (1996). "The open and obvious nature of the condition itself gives caution and therefore the risk of harm is considered slight; people are expected to appreciate and avoid obvious risks." *Id.* While conditions such as fire, height, and bodies of water are commonly considered open and obvious, the rule is not limited to such conditions, and other conditions, including sidewalk defects, may also constitute open and obvious conditions. *Bruns*, 2014 IL 116998, ¶ 17. Whether a condition is open and obvious does not depend on the plaintiff's subjective knowledge but instead depends on the objective knowledge of a reasonable person. *Rozowicz v. C3 Presents, LLC*, 2017 IL App (1st) 161177, ¶ 16.

¶ 39    In this case, the circuit court's grant of summary judgment was based on its determination that the sidewalk condition was open and obvious and, therefore, the Village owed no duty to plaintiff. As an initial matter, we observe that the existence of an open and obvious condition is not a *per se* bar to the finding of a legal duty on the part of the premises owner. *Rexroad*, 207 Ill. 2d at 44. Our supreme court has identified two limited exceptions to this doctrine, including the "distraction" exception, which provides that "a property owner owes a duty of care if there is reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered or will fail to protect himself against it."[3] *Id.* at 44-45. Here, plaintiff does not contend that the "distraction" exception applies, so we have no need to consider whether her act of looking at the nearby driveway constituted a sufficient distraction so as to impose a duty of care on the Village to protect against injury even in the presence of an open and obvious condition. But see *Bruns*, 2014 IL 116998, ¶ 22 ("the mere fact of looking elsewhere does not constitute a distraction").

¶ 40    Plaintiff's primary argument on appeal is her contention that the physical nature of the sidewalk defect provided a factual question as to whether it was open and obvious. Where no dispute exists as to the physical nature of the condition, whether an allegedly dangerous condition is open and obvious is a question of law. *Id.* ¶ 18; *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 34. Where, however, there is conflicting evidence as to the nature of the condition, whether a condition is open and obvious may present a question of fact. *Bruns*, 2014 IL 116998, ¶ 18; *American National Bank & Trust Co. of Chicago v. National Advertising Co.*, 149 Ill. 2d 14, 27 (1992).

---

[3] The other exception, the "deliberate encounter" exception, applies when the property owner has reason to expect that the invitee will proceed to encounter the known or obvious danger, as a reasonable person in his position would determine that the advantages to doing so would outweigh the apparent risk. *Sollami v. Eaton*, 201 Ill. 2d 1, 15 (2002).

¶ 41    Plaintiff points to several cases in support of her contention that the visibility of a condition may affect whether it is considered open and obvious as a matter of law. See *Buchaklian v. Lake County Family Young Men's Christian Ass'n*, 314 Ill. App. 3d 195 (2000) (portion of floor mat, which was the same color as the rest of the floor mat, sticking up); *Nickon v. City of Princeton*, 376 Ill. App. 3d 1095 (2007) (depression in sidewalk which was similar in color to the rest of the sidewalk and partially covered by weeds); *Tarango v. Village of Carpentersville*, 2023 IL App (2d) 220389-U (pothole which was shadowed, and partially blocked, by the plaintiff's vehicle). While we have no quarrel with this general proposition, we cannot find that these cases offer any support for plaintiff's position in the instant case.

¶ 42    The foundation of plaintiff's argument as to the visibility of the asphalt patch is her claim that the presence of shadows from the nearby tree served to obscure the presence of the asphalt and prevent a reasonable person from immediately appreciating the risk posed by the sidewalk condition. The problem, however, with this claim is that it is not supported by the evidence. While plaintiff claims that "[e]very witness who was questioned regarding the visibility of this defect comes to a different conclusion as to what they were able to perceive," not a single witness testified that the presence of shadows from the nearby tree prevented the asphalt strip from being visible, despite extensive questioning by plaintiff's counsel. In fact, the two witnesses who observed the scene at or near the time of plaintiff's fall—Achepohl and Cassiberry—both testified that they had no difficulty observing the asphalt patch; indeed, Achepohl testified that the patch "was very visible." While Cassiberry testified that "I suppose" that the shadows made it more difficult to appreciate the patch as depicted in the photos, she affirmatively testified that she did not have any difficulty observing the asphalt patch when she took the photos.

¶ 43    We find no merit to plaintiff's suggestion that there is a dispute as to the visibility of the patch due to the fact that the witnesses first noticed it after it was pointed out to them. First, with respect to Achepohl, when she walked toward plaintiff, she approached from the north—*i.e.*, from the side of the sidewalk which was at a higher elevation. It thus is entirely unsurprising that she would not encounter the asphalt patch from that direction, as it was ramped downward in order to mitigate the difference in height between the northern slab and the southern slab, which was at a lower elevation. Indeed, even from the photos contained in the record on appeal, the patch is not visible when facing east but is easily observable when facing north or northeast—*i.e.*, in the direction plaintiff would have been traveling at the time of her fall. We also observe that there is a distinction between *noticing* the sidewalk condition and its *visibility*. The fact that the witnesses had the asphalt patch pointed out to them does not in any way suggest that the patch would not have been visible absent such an action.

¶ 44    In this case, there is no dispute that there was a sizeable strip of asphalt covering the uneven sidewalk area in which plaintiff fell, spanning the entire width of the sidewalk. From the photos included in the record on appeal, the asphalt is significantly darker in color than the surrounding sidewalk and appears to be several inches wide. While there were shadows present from the nearby tree, those shadows did not obscure the visibility of the asphalt, and no witness testified that the shadows prevented them from appreciating the presence of the asphalt. Accordingly, we cannot find that there was a dispute as to the visibility of the asphalt patch and agree with the trial court's determination that the sidewalk condition was open and obvious, as it would have been readily apparent to an objective individual encountering it under the same lighting conditions.

¶ 45    As a final matter, we note that, even if a condition is open and obvious, our supreme court has instructed that "[d]etermining that the open and obvious doctrine applies does not end the inquiry regarding duty in a negligence case," and the court should still perform the four-factor duty analysis considering (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against the injury, and (4) the consequences of placing that burden on the defendant. *Sollami v. Eaton*, 201 Ill. 2d 1, 17 (2002); *Bruns*, 2014 IL 116998, ¶ 35. The parties addressed the four factors during briefing and argument on the Village's motion to reconsider, but the circuit court's order granting summary judgment does not expressly discuss the four-factor analysis, finding only that summary judgment was appropriate. As the Village points out, however, the plaintiff's brief does not contend that the circuit court failed to consider these factors or contain any argument concerning the four-factor analysis. Accordingly, plaintiff has forfeited any claim of error concerning the weighing of such factors.[4] See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). As we have determined that the circuit court properly found the sidewalk condition to be open and obvious, we affirm the circuit court's grant of summary judgment in favor of the Village and have no need to consider the Village's alternative argument concerning immunity under the Tort Immunity Act.

---

[4] While plaintiff claims that she raised the four-factor test "in limited fashion" in her appellate brief, we disagree. Plaintiff recited the four-factor test in explaining the general approach in determining duty in a negligence case and noted that "the open and obvious element is closely related to the four-factor duty analysis." There is no argument concerning the application of the test in the instant case, other than a conclusory argument made in her reply brief after the Village raised her forfeiture of the issue.

¶ 46                                    CONCLUSION

¶ 47          For the reasons set forth above, the circuit court's grant of summary judgment is affirmed, as the Village owed no duty to plaintiff where the sidewalk condition causing plaintiff's injury was open and obvious.

¶ 48          Affirmed.